Good morning. Lisa Freeman representing Harbor Missionary Church. By shutting down the church's ministry to the poor and homeless, when there were less restrictive means of addressing its concerns about crime, the city has violated the Religious Land Use and Institutionalized What less restrictive means, if any, did the church suggest to the city? The church submitted a management plan that's available in the record at 2 ER 174-206. And in the management plan, the church laid out all of the measures it was already taking to protect the neighborhood and those measures that, through its discussions with the city, it determined that it could reasonably undertake. The management plan is the church's compromise that the city rejected. Could you just keep your voice up a little? Yes, your honor. And try not to talk too fast. I know that's part of your generation's mystique. But think about Abraham Lincoln at Gettysburg. He didn't say, um... Okay? Yes. So, let me ask you this. How do we know that the folks who were complained of had anything to do with the church? Your honor, that's in dispute, and that's something that the fact finder at the district court will have to determine after a full trial. For the purpose of this appeal, the church can assume that the city has a concern about crime. We don't know whether that's necessarily related to the ministry, but should the city have a concern about crime, it has a police force that it should be using to address those concerns. And here it hasn't explained why it can't use its police force to address concerns about crime instead of substantially burdening the church's religious exercise. Well, did anybody go out in that park when some people were there who were doing things they shouldn't be doing and determine that they were members of this church? The evidence in the record is mainly anecdotal. Neighbors report that there are homeless people that they assume are connected with the church's ministry. The police force has said that there are fewer homeless people in the neighborhood now that the church's ministry is shut down, and there are fewer neighbors complaining. Did this problem of vagrancy, people jumping over the fence and chasing the children in the schoolyard, defecating in public, stay the same before and after the church started its ministry, or did it get worse after the church started the homeless program? Well, according to the city, there were instances during the church's program and not before or after. I don't believe there was a person chasing kids in the schoolyard. I think there was someone who jumped over the fence once. But these questions go to whether the church has a compelling interest, which for the purpose of this appeal, the church isn't disputing. Still, the city must use the least restrictive means possible. You told me where I could look in the record to find out what it was, and frankly, I don't recall reading that part. I must have missed it. What did the church propose? Just summarize. Well, the church was already coordinating its hours with the local elementary school so that congregants would come after the elementary school started and would leave before the children left the neighborhood. It already had a full-time licensed security guard who lived on the church premises. And then during the permitting process, it doubled the number of daily van pickups so that it would pick up congregants from outside the neighborhood and then bring them to points outside the neighborhood after the ministry was over. It doubled those runs when it was consulting with staff. Doesn't doubling the pickups mean doubling the number of people it was bringing into the neighborhood? No, Your Honor, because it meant that fewer people were walking and bicycling into the neighborhood. Instead, they were being picked up by a van and then were leaving the neighborhood afterwards. It picked them up and brought them to the church before school started. After the students were already – oh, was it before? They coordinated it with the school so that there was – They coordinated it with the school hours. Yes. And they had security people check out the park. And they knew the identity of everyone that walked in. Yes. Yeah, they all had to check in. Did they have like a photo ID? Yes, and they did Megan's Law checks. So they denied service to anyone on the Megan's Law list. And then they would escort those people outside the neighborhood using their van service if someone was denied service. Megan, I missed some of the words too. Oh, I'm sorry, Your Honor. What was it? There's a list of child molesters. Yes. And if they came to the church for the homeless services, the church said not you because you're on this list of child molesters? Yes. And they banned them permanently from the ministry. And they would take them in the van to their house or to some other point outside the neighborhood. These were things the church was already doing. And then in consultation with the city, they prohibited dogs from entering the church. They started hosting regular meetings at the church with neighborhood leaders. They started conducting patrols of the neighborhood where they walked around the neighborhood and would notify the police if there was suspicious activity. There's another issue here that's been bothering me. The rights at issue in a RLUIPA case, I think Religious Land Use something, something, something. The rights at issue are the rights of religious people to conduct their free exercise of their religion without being unduly burdened by local land use restrictions. That means the rights at issue are the rights of the religious parishioners. It is not intended and is not written to protect the rights of those served by the practitioners. So, for example, we had another case recently in this court called World Vision where the church conducted its ministry bearing witness as it saw fit under the doctrines of its religion  In this case, the church, I don't think it's disputed at all, is conducting the free exercise of religion by ministering to the homeless. But the homeless people's rights are not the rights protected by the statute under which this litigation is being conducted. It's the church parishioners whose religious rights are being protected. I don't understand why they cannot freely exercise their religion by serving the homeless in an area where there is not the conflict with an elementary school and the other problems that are raised in this neighborhood. That's called, not my neighborhood, somebody else's. Or I think with that case that you mainly relied on, what was it? I can't remember the name. It looked like an East Indian name, maybe a Hindu parish. And what they did is they had a 30-acre parcel in an agricultural area and the government said, no, I don't want to interfere with agriculture. And we said, nonsense. And then there was another case where they ministered to the homeless where the homeless lived instead of bringing them into a different neighborhood where they didn't live. It was an industrial area where a lot of homeless people lived and that's where they ministered. Here the church is bringing them into a neighborhood where they don't live and that's what's raising the issue. And I don't understand why they can't bear witness to their faith and serve the homeless where the homeless are or in some other location. I have three answers to your question. The first is that the Religious Land Use and Institutionalized Persons Act, it's a land use statute. It defines religious exercise to include the use of real property for the purpose of religious exercise. So the religious exercise here isn't just ministering to the homeless in the context of prayer. It's ministering to the homeless in the context of prayer at the church's building, by definition under the statute. Wait, the statute doesn't define what the religious exercise is. The religion defines what the religious exercise is. That's right, and here it's undisputed that it's religious exercise to minister to the homeless the way the church has been ministering to the homeless. And then the statute defines religious exercise to include use of a property for the purpose of religious exercise. So the statute adds an additional layer, which is not only is ministering to the homeless religious, which is now undisputed that the church is ministering to the homeless is religious, but the statute says once you have that, use the property. You're saying the church's religious view is that they need to import some homeless to the neighborhood so that they can minister them at the church rather than going where the homeless are. I think what they're doing is they're bringing these people in. They consider them as part of their congregation. They're there because a major portion of their religion is to help the downcast, help the poor, help people who are hungry, help people who have personal problems. And they bring them in, invite them to the church. They participate in the services. Sure, they get fed. I mean, that's part of their ministry. You can think of a lot of instances where religions want to see that people are not hungry, want to see that they're glad, and want to minister to their problems. And so they're looked upon, just like the Salvation Army does, just like many other organizations. The focus of their religion is reaching out and helping people who need help get back on their feet. Yeah, they're on there. Yeah, they help them. And not cross the street when they see someone. Or not look at them like they're less than human. Yes. People just as we are. Yes. Let me ask you a question about that. I'm talking now. I'm sorry, I thought you were done. This is what it's all about. It's not going out someplace, out in the boondocks and isolating people. It's to bring them in, back into society, so they feel part of it. Yes. And there's so many people out there that just need some of that comfort, some of that fellowship, some of that love, some of that care. Somebody cares if they want to wear clean clothes. So we have a laundry for them. We see that they get food, and they participate with other people. Yes. And their religion with the other folks that are part of this core is to help other people. That's what they're there for. That's what they believe their life is for. Not to accumulate riches, but to minister to people in need. And you can't do that if you put them in isolated someplace. Yes, Your Honor. And as a practical matter, the church owns this church building. And this church bent over backwards to accommodate. Yes. You know, the first city group that worked for the city, they recommended that there be a modification of their permit. And then it went to the Planning Commission. What? To the Planning Commission. The Planning Commission. They divided 50-50, right? Well, originally when it first got to the politicians of the Planning Commission, they denied the permit. And then the city council divided 50-50, which had the effect of affirming. 50-50, yes. Okay, that's right. So instead of dealing with people who need help, the city decided they were just going to do whatever they could to get them out of that neighborhood. And, I mean, there's a big park there. Yes. A big park. The school is nearby. Right next door, there's walls there. They come in before the kids come. They leave before the children leave. And they provide transportation for them. And they provide guards. So they did. Yes, Your Honor. But they felt that they needed to bring them into their church. Yes, and the federal statute has a separate provision when a city totally excludes a religion from its area. And that's not what's at issue here. So clearly the statute meant to protect the use of the church's property not just when there's no other available property, but just the use of the church's property for its own religious exercise. As I see it on the least restrictive means, I read it as somewhat of a mixed record, because while there were indications from the church that it would work with the city to come up with measures, essentially, reasonable measures to deal with the security concerns that the residents and the police and the city was expressing, there were also various written communications indicating that the church would not comply with the proposed conditions. So it's somewhat of a mixed bag. And in the denial, the planning commission had indicated in reference to the instances where the church indicated we're legitimately exercising our right at this particular facility and the restrictions can't be imposed. I take it, and certainly I don't want to know what the details of the discussions were, but I take it that given that this is a balancing of interest, city concerns, and the church's right to exercise or practice its religion, have you been to mediation or sat down with a neutral to kind of talk about the scope of what those reasonable conditions are in the court below? Okay. First of all, Your Honor, there's no evidence in the record that the church ever said that it would not comply with conditions. Although you're right that the church did object to some conditions. Some conditions that were proposed by the city, for example, that the homeless congregants wear name badges while they were in the neighborhood so that they could be identified as congregants, the church had to object to some of the conditions. But it never said that it would not comply with conditions if those conditions were put on the permit. And it said always that any permit would be better and less restrictive than no permit. And the statute does have the balance that the city has to employ. It has to use the least restrictive means available so as to not burden religious activity. And the city's obligation to impose the least restrictive means. So even if the church doesn't agree or objects and preserves its legal objections, the city still has to impose the least restrictive means. Counsel, Judge Pregerson's discussions caused me to think about a possible hypothetical case. This is not your case. This is a hypothetical case about least restrictive alternative analysis and total exclusion. Let's suppose hypothetically that the church felt that it was its duty as a Christian church to minister to the sick. Judaism and Christianity both have the position that ministry to the sick is an obligation of good people. In Judaism, visiting the sick is required and there are all sorts of laws about caring for the sick. Christianity has, as I understand it, analogous doctrines about caring for the sick. Yes, exactly. Now suppose that in carrying out this unquestionably religious duty, the minister of the church proposed caring for people with highly communicable and dangerous diseases. It might be something like measles. It might be something like Ebola. It might be any number of communicable diseases at the church, bringing them in with vans and taking care of them at the church. And the city said, we understand you want to care for the sick, and that's just wonderful. You care for them in the isolation ward at the hospital, or however else people with the particular communicable diseases, tuberculosis is common on the streets, are being cared for. And the church said, no, we feel an obligation to care for them at the church. Would it be an undue burden in that hypothetical case of communicable diseases for the city to say, you cannot care for them at the church. We will not grant a conditional use permit under any conditions for you to care for them at the church. You have to care for them at their homes or in the hospital or however it is that they're isolated from other people while they're communicable. Your Honor, that goes to Judge Wynn's point about this being a balancing test. So under the first step of the RLUIPA analysis, it would impose in your hypothetical a substantial burden to not be able to care for the sick at the church's property, if that's the sincere religious belief. But when you get to the least restrictive means part of the analysis, the city could reasonably determine that it has a compelling interest in protecting the neighborhood from infectious disease, and that the least restrictive way to do that is by denying the permit. So in that case, the city could deny the permit on the second step of the RLUIPA analysis. To answer the last part of my question, I realized I threw a lot in there about whether there have been discussions on what the appropriate, reasonable, least restrictive means is to allow the church to continue practicing its religion at the location, but yet at the same time address the city's concerns. There are a lot of written communications back and forth in the record below. Yes, without divulging any confidential mediation communications, the parties have attempted mediation in this case, and they weren't able to come to an agreement. That said, the city doesn't need agreement to impose the least restrictive means, and in fact, it has the obligation to show the court below that it has imposed the least restrictive means, whether or not the church agrees. I understand that, but sometimes in these balancing things, it just helps us sit down across the table with somebody and work out something. Yes, Your Honor, and the church is willing to do that and has always been willing to talk to the city and to try to come to an amicable solution, because the church doesn't want to be at the center of a controversy. As Judge Fragerson said, the church wants to minister to the homeless and the poor, and it doesn't want a controversy with the neighbors or the city. Is there any evidence that people go into the church and get injections of narcotics? No, Your Honor. And the police and the health authorities are certainly welcome to come in? Yes. And check everybody out? The church, yes. If it even has someone designated to sit with members of the church and suggest policy changes, and the city's got a problem, Ventura's a beautiful place, but there are homeless people all over. Yes, Your Honor. The Beverly Hills yesterday, there are homeless people there. And so we have so many homeless people here in our city and our state because all the mental institutions have been closed. The mental health needs today, those people, many of them, are living out in the streets. And so the folks like this church, this is part of their religious mission, and they work with cities together to take care of the problem. Yes, Your Honor. So what I think ought to be done here is that the city ought to sit down with the church and settle this. I don't see where there's a problem settling it. Your Honor, there's nothing that the church would want more than to settle this with the city. Right now, the church's ministry is closed, and the church feels that loss every day. And so should this court determine that mediation would be a good option, I would ask for an interim order allowing the church to maintain the status quo and continue its ministry while the parties negotiate a settlement. I thought the status quo was the ministry is closed right now, and the church members feel the loss every day. It couldn't be preserving the status quo to let them start it up again while we decide. Well, the status quo is the way it was before there was a dispute. Oh, you mean the status quo ante?  Not the status quo. Right, you're right, Your Honor. Right now, the church ministry is closed. I had a case many, many years ago where they kicked this young man who just got back from Vietnam and who had been student body president of this college. They wouldn't let him enroll because his hair, you know, touched his collar. And so this is when I was a trial judge, and I had the case. I ordered the school to allow him to register. I mean, this guy showed up. He had beautiful blonde hair. But he had a lawyer, a young woman who had short hair. And so it went up to the Ninth Circuit, and the panel that got it, one of them, said, well, the office of a preliminary injunction is to maintain the status quo. The status quo is he's not in school. So it's a misuse of the injunction. But that got turned around. Anyway, we can come up with all kinds of horrible examples and hypotheticals, but we've got to think about the real world and people working together. And how does Ventura County feel about this? Good morning, Your Honors. May it please the Court, Thomas Brown on behalf of the city of Ventura. On behalf of the city. The city. I had several remarks planned, and I've decided now to begin my remarks on a whole different tack, mainly focusing on where Your Honors seem to be going with the appellants just now. What I was struck by is this. I think it's important for us to get back to the applicable standard of review here. What we're faced with is a decision by the district court denying a preliminary injunction. To reach that conclusion, the district court, not this court, was required to weigh competing evidence. And it did so. It was presented with substantial evidence from both parties on all of the issues Your Honors seem to be properly grappling with. The city grappled with them at the administrative level. The district court then grappled with them in ruling on this preliminary injunction. The applicable standard of review is not whether we can perceive now whether that evidence was strong or weak or made sense. Do you want to work this thing out or not? You know. We do, Your Honor. I'm happy to respond to that. Talk about that. I will talk about that. You know, I know this judge. Huh? Yes, Your Honor. Sometimes he's not the nicest person in the world, but I love him anyway. And it was your office that prepared the order that he finally signed, right? We did, Your Honor. How many pages was it? I believe it was 13 or 14 pages. 14 pages. And his comments from the bench were, what, half a page? They were.  I know he does that. I know he does that. And I'm not complaining about that or faulting him for that because they're under a lot of pressure. And, I mean, I served on that court for a long time. So it seems to me that this is going to be a very simple case to work out in accommodation. The city is going to be happy with and the church is happy with. Your Honor is actually. You're from Oakland, right? I'm sorry. You're from Oakland. That's where my office is. Yeah, they've got a lot of problems up there. We do. Yeah. We deal with them sensitively, as does the city of Interim. What did you say? It looks like the district judge here grappled for five pages or four and a half rather than the usual half page. I didn't hear you, Your Honor. It looks like the district judge here grappled for four or five pages rather than the usual half page. Judge Reel did grapple with the issue. He conducted a very lengthy preliminary injunction hearing. Moreover, before he did that, he actually granted the church a TRO application and issued a very thoughtful. We didn't like it at the time, but he issued a very thoughtful opinion granting the TRO. We had no role in writing that one. The factors that he outlined in that TRO order were exactly the factors that he later considered when ruling on a more complete and fully developed record against issuing the preliminary injunction. Well, the least restricted mean standards is pretty tough and for good reason. In the order denying the preliminary injunction, the court below indicated that essentially it's fundamentally incompatible with the neighborhood such that it has to be an outright denial rather than the many, many restrictions that the city planning's own staff had proposed. I'm not sure I agree with that because as I indicated to counsel for the church, it's kind of a mixed record. They indicated that they would comply with the restrictions because that's better than outright denial. There were indications that certain restrictions weren't going to be workable for various reasons, but there were restrictions that the staffers thought would be appropriate, that there could be a compromise here to balance the competing interests of the city and the church. So why is outright denial the least restrictive means that the city could employ? It's a great question, and I'm going to get right to it, but I do want to remind the court that before we ever get to least restrictive means, analytically under RLUIPA, we're first decided. We're aware of that, so let's get to the least restrictive means. As to if you overcome substantial burden, and that was a fact issue for the trial court, not for this court, you then get to the factual determination as to what constitutes least restrictive means. There, Judge Reel again considered conflicting evidence. The church did. They repeatedly stated below, argued below, and just as they argued before this court, that they were always ready, willing, and able to comply with conditions. That was hardly undisputed. Below, we submitted evidence. There was a lengthy declaration, for example, from Jeff Lambert, the city's director of community development, showing exactly what conditions the city proposed and why. Specifically, the church objected to every one of the conditions, not that would have allowed the church to operate safely within its own four walls, but conditions that would have protected the neighbors. Remember here as well, and context matters. The Supreme Court has told us this repeatedly. In reviewing what constitutes the least restrictive means, context matters. What we have here is not a new land use. This was a land use that had a track record. The church started it without a permit back in 2008, and they operated with a dismal record of mismanagement for four years. So when the city staff proposed objections, and the church said repeatedly and vehemently, and we have that in the record that was before Judge Real when he was weighing this evidence, the evidence was it was far from clear to the city, and frankly, it remains far from clear now, that the church ever was willing to comply with the conditions that actually would have saved the neighbors from the daily abuse that they were experiencing over a period of four or five years. How do we know that the people that were creating the problem were part of the church? There was evidence, Your Honor, before Judge Real that we presented, and it was extensive from the city's assistant police chief saying that in his view, all of the problems were attributable to the church. Secondly, we had 60 declarations. What evidence did he have? I'm sorry? What evidence did he have? I'm afraid my hearing is impaired. Come a little closer. I'll come around. Can you hear me now? I'm trying. Well, turn your hearing aid up. You have one? I wish I did. Believe me. If you're a veteran, the VA will give you one free. I'll run out now. I can run out and get one now. You might have to wait. You don't have to wait. You know, all that. The VA does a great job, believe me. But, Your Honor, getting to the question, getting to Your Honor's question, there was evidence presented to Judge Real below from the assistant police chief and from 60 neighbors directly tying all of the difficulties in the neighborhood, not difficulties. Did they ever stop someone and get his name and find out that that person had come to the church? They did. That was in the record before Judge Real. They have a name of someone. They associated individual. And remember, we had 60 declarations, and they were directly associated. The church, when people came in, they had a picture. They'd take roll. They knew who they were. But you know what, Your Honor? Let me ask you this question. Did they stop someone that they thought was doing something improper and then actually tie them in? Yes. Their name, their picture, and everything else? Not by names, but by picture and individual. We have declarations from the police chief, the assistant police chief, and from many, many neighbors that were presented to Judge Real saying that neighbors would- And people are complaining. I know that. Not just complaining. They were very careful in their declarations to tie specific events to harbor's participants. But in any event, Your Honor, we're not conducting a mini-trial. How did they do that? They didn't look at their declarations. They would, for example, follow someone who had just- I'm giving an example out of hand now. But someone would aggressively confront a neighbor or their children, and that person then would be followed. The neighbors were being very diligent in trying to document the problems they were having, and they would follow that aggressor over to harbor, or there would be statements made. They'd follow them over to- They would physically follow in some instances. Put the same bone in the church. Yes, in some cases. And there was- Again, we had 60 declarations, and many of them had this specific connection. In addition, the assistant police chief looked at all of the crime statistics and said that, in his opinion, he tied them directly to harbor's participants. Now, whether that's right or wrong is not before us here under the applicable standard of review. That was for Judge Real, and if he got that wrong or didn't have a complete record, when we go back down and try the case, harbor will have an opportunity to develop that further. But for purposes of our review here on the decision denying the preliminary injunction, it's the end of the story. We are under the abuse of discretion clearly erroneous standard. Now, as to least restrictive means, again, this was a disputed issue of fact. Before Judge Real, below, there was evidence presented.  which exhaustively showed the history of the suggested conditions and harbor's resistance to them. And there was other evidence as well. This was, again, an issue that Judge Real, the district court, was able to weigh. Counsel, help me on one issue here. My biggest problem with your side of the case is that Judge Real thought, quite reasonably, on the basis of history, that the church had been conducting its ministry to the homeless at the Kingdom Center. That was evidently based on the church's own conduct, consistent with the church's beliefs about a proper way to conduct its ministry. So he concluded they could continue to conduct their ministry to the homeless at the Kingdom Center. Only problem with that is the Kingdom Center had been closed, or has been closed. I can't remember the exact sequence of dates. Yes. What do we do about the Kingdom Center being closed, and where else can the church conduct its ministry if it doesn't conduct it in the church building? The evidence was presented to Judge Real. And, by the way, Your Honor, I believe that Judge Real was led into that colloquy in part by us. Be sure to get to my point before I forget my question, and you do too. I will. Alternative locations. The evidence was presented, and Judge Real had it before him, that there are 13 different zoning districts in the city, not just properties, entire zoning districts in which the church can conduct its ministry. Is there a place like the Kingdom Center, some facility? There are five or six. Remind me what they are. They're in the record of one was the Salvation Army. We listed five different organizations that are, I call them professional homeless advocacy organizations, homeless service providers. They testified, by the way, as well, that they would never conduct their church outreach. Look, guys, we're wandering away from my question. Yes. And I really want an answer. The judge says they were caring for the homeless at the Kingdom Center, so evidently they could act on their religious beliefs by doing it at the Kingdom Center. Right. And it would not be a substantial burden, as the term has been defined in the case law, to say you can't do it at your church building, you have to do it at the Kingdom Center. That's right. It turns out the Kingdom Center is closed. Now, leaving out rhetoric and all the bad things that the church has done in the past and leaving out everything else, just tell me where they can care for the homeless. I thought I was being responsive to that when I said there are 13 zoning districts in which the church can conduct its ministry without even obtaining a discretionary permit. But is there a facility in one of those districts where the homeless can be cared for in the same way that they're caring for them at the church? All of those provide it. And the evidence there was from the city's Homeless Outreach Coordinator, Peter Brown, and the evidence was before Judge Real again, saying that the services that Harbor is providing are available to these people, to their participants, equally at these five sites. I think where they are now, they've got a church basement and they have washing machines for the homeless people's clothes and that sort of thing and showers for the homeless people. So what I'm looking for is someplace other than the Kingdom Center where they have those kind of things or can easily put them in. And that is in the record? Not just a zoning district. I mean, what am I going to do, build a $10 million building with $10 million I don't have so I can do something in another district? Well, that's certainly part of the applicable RLUIPA jurisprudence. Are you saying that there are other organizations out there in that area that supply the same and offer the same services and that these folks ought to go to those other organizations? Yes, that is in the record that was presented to Judge Real. So they ought to just go there and forget about this church? Well, remember, RLUIPA is not a free pass around local zoning. Let's look at the example that Judge Kleinfeld raised earlier, which is let's say they wanted to conduct their ministry such that they had to nurse very sick patients in a residential neighborhood with communicable diseases. Or the more common thing we see in the RLUIPA cases is where a church says, our ministry requires us to build a church school, an enormous church school, or a hospital. Well, RLUIPA doesn't say that because they want to conduct that activity and extend their use in any location they want that it's a free pass or I think the courts have said blanket immunity. No one's really arguing that there's a free pass here. I think, Your Honor, that's a fair reading of what Harbor's arguments have been, is that there is a categorical rule that prevents a city from saying no. Just because they say we have a location and we want to conduct our ministry. I didn't read all this that way. The way I read it was that these folks are willing to accommodate the city's needs on that property that's the only property they have. And they're willing to cooperate with the city and work with the city. And I didn't get that. That they're saying, no, we're here, we're going to stay here, we're going to do what we want, we're going to have needles all over the place, we're going to have people use the park to go to the bathroom, and all the rest of it. I didn't read that. Well, whether they did or don't, Your Honor, was a factual call for Judge Reel to make and he made it based on extensive evidence that we presented him that the church was not ready, willing, and able to cooperate. The church did not agree. Maybe it's the way you approached it. Not a hard problem to solve. Well, Your Honor, this is a social issue. This gets buried under a rug, you know. No one is suggesting that. And you go right down here in Pasadena, Salvation Army is right down the road. They're taking care of a lot of people. And there are others. There's a Union Station place over here. I bet they're not doing it without a use permit, Your Honor. I don't know. Next time I think about it, I'll call them and say, send me a copy or a use permit. The idea is that what facilities does the city of Ventura provide? Peter Brown, again, who is the city's homeless outreach coordinator. The outreach coordinator. Sometimes they do a good job. Sometimes they don't. But what is the Ventura, city of Ventura? He describes it in his declaration, Your Honor, what the city is doing. Are you going to tell us what he said? In the declaration, he describes the expenditures the city has made over years, the programs and the efforts that the city makes to partner with the five different organizations that exist in the city to provide the exact services Harbor is providing in an appropriate setting. And it's been doing it for years and years with great results, by the way. He declares in his declaration that their efforts have resulted in a stark difference. And what areas of the city are these located? All over the city. And, as I said, these activities are permitted as a matter of right in 13 different zoning districts, just not in a residential district. Where's the major one? I can't tell you that, Your Honor. It's not clear from the record as to which one did constitute or didn't constitute the major. I can tell you what the record does reflect is that there were five different organizations providing these services and that when Harbor shut its doors, there was not a spike of need noted. In other words, there wasn't a spike of what? Of need presented because of Harbor shutting its doors. In other words, the homeless folks who had been receiving services from Harbor were getting them elsewhere. I don't see why that matters. I mean, what's at issue here is not whether the homeless people's needs are taken care of, it's whether Harbor's parishioners' religious views are taken care of. It may be that all the homeless are perfectly happy, but if you have a religious need to care for the homeless, you've got to find some and take care of them. That's exactly right. And Judge Reel had the evidence before him of the various ways that Harbor can, alternative ways, that Harbor can still exercise this part of its power. I was just looking at the supplementary order that you submitted in response to Judge Reel's request that you do so. And it doesn't have, it's not in the usual findings of fact conclusions of law decision form. Does it say in here where else the Harbor members of the church could take care of the homeless? It doesn't say specifically. It cites to the fact that there were other zoning districts and that there were other providers within the city. But it relied on the fact that that evidence had been presented and considered. And the order was written in a manner to largely track the form that Judge Reel had used in granting the TRO previously. It undertook to address all of the injunction standards, as well as the chiefly contested issues that we had litigated in that PI hearing. I keep thinking about Father Damien. He went to Molokai to care for the lepers. He didn't bring the lepers back to where he came from. His heroic martyrdom was to go to Molokai. And I'm wondering where Molokai is in this record. The way it was approached in the evidence that was presented was this. That because largely the entire city is available to Harbor to conduct this ministry as a matter of right with no permit requirement. And that's a key issue, by the way, that is raised by the case law. Indeed, even in their reply brief they cite an article from the Fordham Law Review talking about the availability of alternatives and whether that's relevant. And that article actually supports the city's position and says a key component of that is where a city allows the use as a matter of right with no discretionary permit requirement, then alternatives are properly in play. Their own article says that. That's what Judge Reel had before him. In addition to the fact that there was evidence presented to him, as I said, of these five other service providers in the city. Well, those five other service providers accept this Harbor Church's members to help. We don't know. There is no evidence. What we do know, however, was that with respect to the Kingman Center, Harbor had been conducting its ministry at another location in cooperation with another church. And that was another factor that Judge Reel had before him was Harbor's history at the Ventura Kingdom Center. We agree, by the way, that the Kingdom Center no longer exists in Ventura. However, when Judge Reel made that comment on July 9, the only evidence in the record was the evidence that we had presented on Kingdom Center, which discussed the fact that Kingdom Center had existed in Ventura and had been in operation. It was only after the July 9 hearing that Harbor for the first time presented evidence that the Kingdom Center Ventura no longer existed. You know, there's some view that in dealing with our homeless population, and that it's not desirable to have them concentrated in one area of town, like Skid Row, because there are a lot of things that happen there. There are a lot of temptations. Many of these people have got problems with drugs and with drinking and with other emotional problems. And the best that can be done for them is to have them get away from that environment. I appreciate that. If I might remark briefly, it's not for me to agree or disagree, Your Honor. You don't have an opinion on anything? I don't, Your Honor. I have my own opinions, but they're not relevant to this Court's review, appellate review, of what Judge Reel did. I would like to respond briefly to Judge Wind, your concern about least restrictive means, and specifically with respect to Harbor's argument under the Hobby Lobby and Holt cases. They're essentially saying that least restrictive means means that the city is required to, in some manner, subsidize the mitigation of impacts created by a land use applicant. It's important to recognize how mischievous that argument is. There is no case, and Hobby Lobby and Holt certainly don't say it, that suggests that that's the case. That, in fact, a city, in a land use context, is required to subsidize the mitigation of adverse impacts created by a land use applicant. And if you look at the logical or illogical extension of where that can go, its absurdity becomes apparent. Many churches propose, as I said, a new church college or church school. Those uses carry with them land use impacts recognized under the Environmental Equality Act, for example. Traffic, sewer, stormwater runoff, that require expensive mitigation. If there are traffic impacts created by a new college or church university, you might have to obtain rights to entire new lanes of traffic and install traffic signals. Those are expensive mitigation measures. Similarly, those kinds of projects require the installation of expensive stormwater, oversized stormwater facilities. Is Harbor arguing that under Hobby Lobby, that a city is required, as part of the subsidy that Hobby Lobby refers to, is required to subsidize those mitigation measures? It's nonsensical just to pose the question. Well, what mitigation measures are you talking about? They're saying that we have to hire a new cop or two, that we have to pay for, out of our own general fund, we have to pay for the cost of policing the secondary impacts they're inviting into the neighborhood. And I'm saying no case has ever supported that. Oh, no, I didn't read the argument that way. When you talk about balancing interests, if you're arguing at the extremes, it's always going to sound like it's insupportable. But if, in order to avoid the substantial burden on the right to practice religion, you send a patrol car, an extra round or two in the neighborhood, well then that might be something that's a little more reasonable. It's a little more. But actually, the police chief submitted evidence to Judge Real that it wasn't all that reasonable, and that it had a fairly significant deleterious effect on his policing operations in the city of Ventura, to do exactly what Harbor was saying we were required to do under RLUIPA. So, yeah, I think that my examples were certainly very extreme, but they weren't extreme, and the evidence was presented that there would be a very difficult effect. And that was a decision, that was a factual weighing for Judge Real, and not for this court. Anything else? No, Your Honor. Thank you. Your Honor, I'd like to reply. Yes. First of all, counsel said that there are other existing homeless services organizations with which the church can partner, but not to provide the service that it's providing now, which is a spiritual service, in addition to providing for basic survival needs. I'm sorry. Salvation Army provides spiritual services. I think it's just part of the requirements there, isn't it? Well, there's no evidence in the record that Harbor could minister to the homeless in the way that it's doing now with prayer, spiritual counseling at the Salvation Army or anywhere else. Isn't that just what Salvation Army does? I mean, the idea was it's an army of people serving a religious purpose. And I don't know if they still do it. Don't they sing hymns and stuff like that before serving a meal? Sing hymns and say prayers before serving the meal? Don't they do that anymore? Your Honor, I don't know if they do that or not, but I do know that since it was required to close its ministries, the church has not been able to minister the way it did before, and it would if it could. Can the church, will these organizations, is there anything in the record about whether the Harbor Church can provide volunteers from among its members who will serve the needs of the homeless at these other organizations' facilities? Well, what the order drafted by the city says is that Harbor could separate its religious ministry and continue that at its church building, what it calls religious. No, no, I accept your argument that part of the religious ministry is, in fact, caring for the homeless. Yes, and ministering. I don't think that's disputed, ministering to the needs of the homeless. What I want to know is does the record show whether they can or cannot minister to those needs at these other facilities in Ventura? Harbor is not aware of any place where it can provide the combination of services that it provides at its church. Does the record show that they asked and were turned down? Does the record show that they were accepted? Does the record show one way or another whether they can minister to the needs of the homeless at these several other facilities in Ventura? There's no evidence that they can in the record. Well, wasn't there some suggestion that's the expense? That ministering at another location would be an expense? Right. It couldn't bear the expense. The church wouldn't be able to bear the expense. Yes, the church has very limited means. What expense? Well, it couldn't open up a new building, for example, and minister to the church there. And it's unaware of any organization that it could partner with to provide this combination of services. And the city hasn't provided any evidence that it could. And, in fact, in its order, the way it gets around the city says there are these several other facilities, not just zoning areas but facilities. Facilities, I assume, means buildings, physical facilities. So that's why I asked what expense. Did they say, did Harbor ask and they said, we'll only let you minister to the homeless at our facility if you give us $2,000 a month or what? What expense are you talking about? Well, no. Okay, so the organizations that exist now don't provide the kind of religious ministry that Harbor Church provides. Right. That's why Harbor would like to do it. And what I want to know is, can it do it there? At a secular – At the Salvation Army building. There's no evidence that they could provide what they provide at their church at the Salvation Army building. Well, that's why you'd need Harborview to provide it. Most towns, even my little town, have buildings where the Salvation Army is. And what I'm wondering is, is there any evidence? We're talking abstractions like expense. I want to know particulars. Is there any evidence that Harbor Church can't just have some of its volunteers who care for the homeless to load up some of the washing machines and other things they have at their church into pickup trucks, run them over to the Salvation Army, and the Salvation Army let them use their basement for the washing machines and conduct their program at the Salvation Army building? Or these other – I think it was six facilities total. I think maybe if you look at the schedule laid out in the management plan and you see the hours of prayer in first verse, this is the kind of program that can run out of a secular organization. And I think the Salvation Army runs – The Salvation Army is not a secular organization. In any way, churches have church programs all the time in secular facilities. My own temple, for a long time, we met in the conference room of a furniture store. There's nothing that requires something that looks like a Gothic cathedral to provide religious services? I don't know what the secular building has to do with anything. What is the element of welcoming in the homeless into the church building, which is part of the religious process? The answer is that each of these providers, they have their own sphere. They're – many of them are competing for grants from the same organization. It may be that – I don't know what the city of Ventura does, but they may have grants that come through the federal government. Can that be a religious purpose if it's about the money? And they make decisions. You know, there's competition between these various groups. Friendly competition. And RLUIPA is a land-use statute. Would the religious competition for money be protected by RLUIPA? What's protected is the church's ability to use its church building. So the discussion of whether it can use other buildings. I'm trying to find out about whether the possible negative impact on getting grants if they use some other group's building would be a protected interest under RLUIPA. Well, this part has held that where there's a substantial delay, expense, and uncertainty in finding another location or using another location, that that's a substantial burden under RLUIPA. Let me ask you this. Do you think there's a problem with this church? I mean, don't you think they'd agree to the conditions that the city has laid out? The church is willing to agree to reasonable conditions. The city speculates that the church won't comply, but I would direct you to our reply brief at page 19, where we list all of the times that the church said that it would comply with any lawful restrictions imposed on the permit. And as you know, an objection to a condition is different from civil disobedience and a threat not to comply. The church has always said that it's law-abiding and would comply. And now it's the city's burden under the statute to impose that less restrictive means if there is one available. And here, the city isn't even arguing that there is no less restrictive means. They've said perhaps limits on the number of hours, the number of people, would protect our interests, and they want the church to propose those restrictions on its own religious practice. But the statute puts the burden on the city to do that. Okay. I think, you know, this is supposed to take a half hour or so. But we're always dealing with eternity, aren't we? Your Honor, if I may say one more thing. The statute itself provides that the city may have to incur expenses to not impose a substantial burden. And the Supreme Court unanimously in Holt, and in a divided opinion in Hobby Lobby, said that the government might have to bear expenses. And here, the city never provided evidence of what those expenses would be and why they shouldn't have to bear them in this case. And a trial will determine what the least restrictive means are. Yeah, because, you know, we're all in this together, and we can't ignore the problems. You know, we're a humanitarian nation, and we've got to make sure we solve these problems together. A lot of them have been created by government. Thank you. As Ronald Reagan once said, when he closed down the mental institution, save money, you know. That was in the 70s. I don't think he made it back then. What? They closed it down in the 70s. No, no, no, no. All right. Thank you. Thank you, Your Honor. Let's see.
judges: Pregerson, Kleinfeld, Nguyen